No. 25-2960

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| AMERICAN ASSOCIATION FOR ACCESSIBLE MEDICINES, | ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 1:24-cv-00544 |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, | ) ) ) ) | The Honorable |
| Defendant-Appellee. | ) ) | VIRGINIA M. KENDALL, Chief Judge Presiding. |

**BRIEF OF DEFENDANT-APPELLEE**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for Defendant-Appellee

**CARSON R. GRIFFIS**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ...................................................................................iii

JURISDICTIONAL STATEMENT ......................................................................... 1

ISSUES PRESENTED FOR REVIEW.................................................................... 3

STATEMENT OF THE CASE .................................................................................. 4

Price Gouging by the Pharmaceutical Industry ................................................. 4

The Act's Prohibition on Price Gouging .............................................................. 5

The Dismissal of AAM's Original Complaint..................................................... 7

AAM's Amended Complaint.................................................................................. 9

AAM's Renewed Preliminary Injunction Motion ............................................ 11

SUMMARY OF ARGUMENT................................................................................ 15

ARGUMENT ........................................................................................................... 18

I.      This court should review AAM's standing *de novo* and the denial of its
        preliminary injunction motion for an abuse of discretion................................ 18

II.     AAM lacked standing because it failed to establish that its members
        would engage in price gouging proscribed by the Act or that the Act's
        enforcement was imminent................................................................................ 19

III.    Lack of standing aside, the district court correctly denied AAM's
        preliminary injunction motion.......................................................................... 25

        A.      AAM is unlikely to prevail on its dormant Commerce Clause
                claim....................................................................................................... 26

                1.      AAM's extraterritoriality claim will fail because the Act
                        does not discriminate in favor of in-state interests ..................... 27

                2.      AAM's extraterritoriality claim will fail even if it does not
                        have to show that the Act discriminates against
                        out-of-state interests in favor of in-state interests ..................... 32

3. This court's pre-*Ross* precedent does not compel a different result ................................................................. 35

4. AAM's reliance on other circuits' precedent is unpersuasive ............................................................................ 40

5. AAM waived its argument that the Act violates the horizontal separation of powers for purposes of its preliminary injunction motion and, waiver aside, its argument fails................................................................................. 44

B. AAM failed to make a clear showing that it would suffer irreparable harm unless the Act was enjoined while its case was pending ............................................................................. 46

C. The district court did not abuse its discretion in determining that the equities favored the Attorney General ...................................... 53

CONCLUSION ................................................................................................. 56

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

CERTIFICATE OF FILING AND SERVICE

**TABLE OF AUTHORITIES**

*Page(s)*

**Cases**

*Alliant Energy Corp. v. Bie,*
    336 F.3d 545 (7th Cir. 2003) ............................................................31

*Am. Amusement Machine Ass'n v. Kendrick,*
    244 F.3d 572 (7th Cir. 2001) ............................................................51

*Am. Hosp. Ass'n v. Harris,*
    625 F.2d 1328 (7th Cir. 1980) ..........................................................50

*Arcidiacono v. Whitehorn,*
    178 F.4th 338 (7th Cir. 2026) ...........................................................25

*Ass'n for Accessible Meds. v. Bonta,*
    766 F. Supp. 3d 1020 (E.D. Cal. 2025) ............................................43

*Ass'n for Accessible Meds. v. Ellison,*
    140 F.4th 957 (8th Cir. 2025) ......................................................41, 42

*Ass'n for Accessible Meds. v. Frosh,*
    887 F.3d 664 (4th Cir. 2018) .......................................................40, 41

*Baldwin v. G.A.F. Seelig, Inc.,*
    294 U.S. 511 (1935) ....................................................................27, 28

*Bazile v. Fin. Sys. of Green Bay, Inc.,*
    983 F.3d 274 (7th Cir. 2020) ..............................................................1

*BBL, Inc. v. City of Angola,*
    809 F.3d 317 (7th Cir. 2015) .......................................................46, 49

*Bedrossian v. Nw. Mem'l Hosp.,*
    409 F.3d 840 (7th Cir. 2005) ............................................................49

*Bell v. Keating,*
    697 F.3d 445 (7th Cir. 2012) ............................................................18

*Bevis v. City of Naperville, Ill.,*
    85 F.4th 1175 (7th Cir. 2023).............................................................51

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
476 U.S. 573 (1986) ................................................................. 27, 28

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) ........................................................... 19, 21, 22

*Comptroller of Treasury of Md. v. Wynne*,
575 U.S. 542 (2015) ..................................................................... 52

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987) ........................................................... 33, 35, 46

*Davis v. Farmers Co-Op. Equity Co.*,
262 U.S. 312 (1923) ..................................................................... 34

*Dean Foods Co. v. Brancel*,
187 F.3d 609 (7th Cir. 1999) ................................................ 36, 37, 38

*Dep't of Revenue of Ky. v. Davis*,
553 U.S. 328 (2008) ..................................................................... 26

*e360 Insight v. The Spamhaus Project*,
500 F.3d 594 (7th Cir. 2007) ...................................................... 48, 54

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) ................................................................ 30, 32

*Flynt v. Bonta*,
131 F.4th 918 (9th Cir. 2025) ....................................................... 43

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*,
35 F.3d 1134 (7th Cir. 1994) ........................................................ 50

*Grand River Ent. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) ........................................................... 51

*Grubhub Inc. v. Relish Labs, LLC*,
80 F.4th 835 (7th Cir. 2023) ......................................................... 25

*Healy v. Beer Inst.*,
491 U.S. 324 (1989) ................................................................ 27, 28

*Hildreth v. Butler*,
960 F.3d 420 (7th Cir. 2020) ........................................................ 45

*Hirst v. Skywest, Inc.*,
910 F.3d 961 (7th Cir. 2018) ....................................................................52

*Howard v. Wal-Mart Stores, Inc.*,
160 F.3d 358 (7th Cir. 1998) ..........................................................43, 52

*Hughes v. Alexandria Scrap Corp.*,
426 U.S. 794 (1976) ....................................................................................35

*Ill. Tamale Co. v. LC Trademarks, Inc.*,
164 F.4th 648 (7th Cir. 2026) ...................................................................18

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1997) ..........................................................38, 39

*Ind. Fine Wines & Spirits, LLC v. Cook*,
459 F. Supp. 3d 1157 (S.D. Ind. 2020) ...............................................52

*Ind. Right to Life Victory Fund v. Morales*,
66 F.4th 625 (7th Cir. 2023) ....................................................................21

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chi.*,
56 F.4th 437 (7th Cir. 2022) ....................................................................51

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ....................................................................................34

*K.C. v. Indiv. Members of Med. Licensing Bd. of Ind.*,
121 F.4th 604 (7th Cir. 2024) ...................................................................53

*Kendall-Jackson Winery, Ltd. v. Branson*,
82 F. Supp. 2d 844 (N.D. Ill. 2000) ..........................................52, 53

*Laird v. Tatum*,
408 U.S. 1 (1972) ........................................................................................22

*Legato Vapors, LLC v. Cook*,
847 F.3d 825 (7th Cir. 2017) .............................................36, 37, 38, 39

*Lewis v. Ind. Dep't of Transp.*,
173 F.4th 876 (7th Cir. 2026)...................................................................45

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ...................................................................... 18

*Midwest Title Loans, Inc. v. Mills*,
593 F.3d 660 (7th Cir. 2010) .......................................... 36, 37, 38

*Mosaic Fin. Ltd. v. Mut. S'holder Servs., LLC*,
767 F. Supp. 3d 619 (N.D. Ohio 2025) ....................................... 43

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ............................................................... *passim*

*Nat'l Shooting Sports Found., Inc. v. Bonta*,
718 F. Supp. 3d 1244 (S.D. Cal. 2024) ....................................... 43

*Nat'l Shooting Sports Found., Inc. v. James*,
144 F.4th 98 (2d Cir. 2025) ....................................................... 43

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025) ...................................... 43

*Orr v. Shicker*,
953 F.3d 490 (7th Cir. 2020) ..................................................... 25

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ............................................................. 26, 35

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
2 F.4th 1002 (7th Cir. 2021).................................................... 21

*Preston v. Thompson*,
589 F.2d 300 (7th Cir. 1978) ............................................... 51, 53

*Rivet v. Regions Bank of La.*,
522 U.S. 470 (1998) ........................................................... 38, 39

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ..................................................... 48

*Second City Music, Inc. v. City of Chi.*,
333 F.3d 846 (7th Cir. 2003) ..................................................... 47

*Shafer v. Farmers' Grain Co. of Embden*,
268 U.S. 189 (1925) ........................................................... 34, 35

*Shaffer v. Heitner,*
433 U.S. 186 (1977) ...................................................................................... 34

*South Dakota v. Wayfair,*
585 U.S. 162 (2018) ...................................................................................... 33

*Speech First, Inc. v. Killeen,*
968 F.3d 628 (7th Cir. 2020) ............................................................... *passim*

*Staffing Servs. Ass'n of Ill. v. Flanagan,*
720 F. Supp. 3d 627 (N.D. Ill. 2024) ............................................................ 49

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024) ...................................................................................... 31

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
600 U.S. 181 (2023) ...................................................................................... 19

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ...................................................................................... 21

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ................................................................................. 19, 20

*Sweeney v. Raoul,*
990 F.3d 555 (7th Cir. 2021) .................................................................... 21, 22

*Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue,*
483 U.S. 232 (1987) ...................................................................................... 52

*United Haulers Ass'n v. Oneida-Herkimer Solid Wast Mgmt. Auth.,*
550 U.S. 330 (2007) ...................................................................................... 26

*Walker v. Baldwin,*
74 F.4th 878 (7th Cir. 2023) ......................................................................... 44

*Walker v. Groot,*
867 F.3d 799 (7th Cir. 2017) ......................................................................... 45

*Whitmore v. Arkansas,*
495 U.S. 149 (1990) ...................................................................................... 19

*Whole Woman's Health v. Jackson,*
  595 U.S. 30 (2021) ...................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ....................................................... 18, 25, 53

*Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey,*
  172 F.4th 976 (7th Cir. 2026) ................................... 48, 50, 53

*Younger v. Harris,*
  401 U.S. 37 (1971) ...................................................................... 20

**Statutes**

28 U.S.C. § 1292(a)(1) ................................................................. 2

28 U.S.C. § 2107(a) ...................................................................... 2

28 U.S.C. § 1331 ........................................................................... 1

42 U.S.C. § 1983 ........................................................................... 1

410 ILCS 725/1 ............................................................................. 1

410 ILCS 725/2 ........................................................................... 53

410 ILCS 725/2(b) ........................................................................ 5

410 ILCS 725/2(e) ................................................................... 5, 35

410 ILCS 725/5 ...................................................................*passim*

410 ILCS 725/10(a) .............................................................*passim*

410 ILCS 725/10(b) ................................................. 6, 7, 22, 47

410 ILCS 725/10(c) ................................................. 6, 7, 22, 47

410 ILCS 725/10(d) ...................................................................... 6

410 ILCS 725/99 ................................................................. 22, 49

Ind. Code § 7.1-7-2-15 ............................................................... 36

Minn. Stat. § 62J.842 subd. 1 ...................................................................... 42

**Other Authorities**

Fed. R. App. P. 4(a)(1)(A).............................................................................2

7th Cir. R. 28(b)............................................................................................ 1

Stephen E. Sachs, *Dormant Commerce and Corporate Jurisdiction*,
        2023 Sup. Ct. Rev. 213 (2023).........................................................34

**JURISDICTIONAL STATEMENT**

Plaintiff-Appellant Association for Accessible Medicine's ("AAM") jurisdictional statement is not complete and correct.  As required by 7th Cir. R. 28(b), Defendant-Appellee Kwame Raoul, in his official capacity as Attorney General for the State of Illinois, provides this statement.

AAM, an association representing pharmaceutical manufacturers and distributors, filed an amended complaint — the operative one in this case — in the district court under 42 U.S.C. § 1983, claiming that Illinois's Pharmaceutical and Health Affordability:  Restrictions on Manufacturers' Amoral Behavior through Reasonable Oversight Act ("Act"), 410 ILCS 725/1 *et seq.*, violated the United States Constitution's dormant Commerce Clause, Due Process Clause, and "horizontal separation of powers."  A182-83, A207-12.[1]  AAM sought declaratory and injunctive relief.  A212-13.

As explained *infra* pp. 19-25, the district court lacks subject-matter jurisdiction over AAM's action because it lacks standing.  *See Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) ("standing is an essential ingredient of subject-matter jurisdiction").  The district court otherwise has subject-matter jurisdiction over AAM's action under 28 U.S.C. § 1331 because it raises federal questions.

---

[1]  The district court docket, which is the record on appeal, is cited as "Doc. __," and this court's docket is cited as "7th Cir. Doc. ___."  AAM's opening brief is cited as "AT Br. __."  The short appendix to AAM's opening brief, as well as its two-volume separate appendix, are cited as "A___," as all appendices are consecutively paginated.

AAM filed a motion for a preliminary injunction based on its dormant Commerce Clause claim, Doc. 52 at 15-23, which the district court denied on September 26, 2025, Doc. 85 at 1. On October 16, 2025, AAM filed a notice of appeal, Doc. 88, which was timely because it was filed within 30 days of the district court's order denying AAM's request for an injunction, *see* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A). This court has jurisdiction over AAM's interlocutory appeal under 28 U.S.C. § 1292(a)(1).

**ISSUES PRESENTED FOR REVIEW**

1. Whether AAM lacked standing to seek a preliminary injunction because it failed to present evidence that enforcement of the Act's price-gouging prohibition against any of its members was imminent.

2. Whether, lack of standing aside, the district court did not abuse its discretion in denying AAM's motion for a preliminary injunction because AAM is unlikely to succeed on the dormant Commerce Clause claim, AAM failed to prove it would be irreparably harmed before a resolution on the merits, and the equities favored the Attorney General and the public interest.

## STATEMENT OF THE CASE

**Price Gouging by the Pharmaceutical Industry**

Generic prescription drugs reach consumers through a supply chain involving numerous parties, including manufacturers, wholesale distributors, pharmacies, hospitals, and other healthcare facilities. A187. Manufacturers set the "baseline price" of a medicine, known as the "wholesale acquisition cost." Doc. 62 at 15-16; *see* Doc. 58 at 8.[2] Sometimes, manufacturers sell drugs directly to pharmacies; in others, they sell drugs to wholesale distributors, which resell them further down the supply chain. Doc. 58 at 8-9. In either case, manufacturers negotiate the prices that pharmacies or wholesalers pay for generic drugs based on the wholesale acquisition cost, which is then passed on to consumers. *Id.*

In the early 2010s, reports of skyrocketing prices for generic prescription drugs — in some instances, increases as large as 2,060% or 17,000% — proliferated. *Id.* at 11-12. In late 2016, a United States Senate Special Committee authored a report finding that a lack of competition was the "primary driver" of these price hikes.[3]

---

[2] Citations to Doc. 58 in this subsection are to the facts set forth in the Attorney General's opposition to AAM's preliminary injunction motion, of which the Attorney General asked the district court to take judicial notice. Doc. 58 at 2 n.1. AAM did not oppose the Attorney General's request that the court take judicial notice of these facts. *See* Doc. 62 at 6-22.

[3] U.S. Senate Special Committee on Aging, *Sudden Price Spikes in Off-Patent Prescription Drugs: the Monopoly Business Model that Harms Patients, Taxpayers, and the U.S. Health Care System*, at 29 (Dec. 2016), *available at* https://bit.ly/4a0EsNr.

Around the same time, state Attorneys General began to investigate widespread price fixing in the generic drug industry.[4]

These investigations and resulting enforcement actions have continued through recent years. For example, AAM member Sandoz, Inc., admitted its guilt to federal charges of conspiracy to fix prices in 2023. Doc. 58 at 12. In early 2025, Sandoz paid $275 million to settle claims that it conspired with other generic drug manufacturers to artificially inflate the prices of nearly 200 generic drugs.[5] And in February 2026, a coalition of 42 States and territories, including Illinois, filed a complaint against Sandoz and other generic drug manufacturers alleging further price fixing with respect to over 30 drugs.[6]

**The Act's Prohibition on Price Gouging**

Recognizing a "repeated pattern and practice of price gouging by certain prescription drug manufacturers," the Illinois General Assembly enacted the Act to "address accessibility of . . . life-saving medications" in Illinois. 410 ILCS 725/2(b), (e). The Act generally prohibits a "manufacturer or wholesale drug distributor" from

---

[4] *See* Press Release, Office of the Connecticut Attorney General, Court Unseals States' Latest Generic Drug Complaint, Including Excerpts from "Diary of Collusion" Meticulously Documenting Widespread Price-Fixing, https://bit.ly/3PiH6r0 (Jan. 28, 2021) (describing six-year investigation by coalition of 51 States and territories into generic drug price-fixing).

[5] *See* Memo. of Law in Support of Motion for Preliminary Approval of Sandoz Settlement, *In re: Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL No. 2:16-md-02724-CMR, ECF No. 3253-1 at 10, 12, 63-72 (M.D. Pa. Feb. 14, 2025).

[6] Complaint, *Connecticut v. Novartis AG*, No. 2:26-cv-00160, ECF No. 1 at 357-59 (D. Conn. Feb. 2, 2026).

engaging in "price gouging in the sale of an essential off-patent or generic drug that is ultimately sold in Illinois." *Id*. § 10(a).

It defines "price gouging" as "an unconscionable increase" in a prescription drug's price that:

(1) would result in the wholesale acquisition cost of a 30-day supply of the essential off-patent or generic drug exceeding $20 and would result in an increase in the wholesale acquisition cost of the essential off-patent or generic drug of:

   (A) 30% or more within the preceding year;

   (B) 50% or more within the preceding 3 years; or

   (C) 75% or more within the preceding 5 years; and

(2) is otherwise excessive and unduly burdens consumers because of the importance of the essential off-patent or generic drug to their health and because of insufficient competition in the marketplace.

*Id*. § 5. But price gouging is not a "price increase that can be reasonably justified by" either: (1) "an increase in the cost of producing the essential off-patent or generic drug"; or (2) "the cost of appropriate expansion of access to the essential off-patent or generic drug to promote public health." *Id*. And "[i]t is not a violation of th[e] Act for a wholesale distributor to increase the price of an essential off-patent or generic drug" by any amount "if the price increase is directly attributable to an increase in the wholesale acquisition cost for the essential off-patent or generic drug imposed on the wholesale drug distributor by the manufacturer of the drug." *Id*. § 10(a).

The Attorney General is tasked with enforcing the Act's price-gouging prohibition. *See id*. § 10(b)-(d). When the Attorney General "has reason to believe that a manufacturer or wholesale drug distributor" has violated the Act, he "may

send a notice" to the manufacturer or distributor requesting certain information, to which the manufacturer or distributor has 45 days to respond. *Id.* § 10(b). The Attorney General may also issue subpoenas and take depositions when investigating suspected violations of the Act. *Id.* And he may seek relief in Illinois court to compel compliance with his investigation. *Id.* § 10(c)(1).

The Attorney General may pursue an action in state circuit court for injunctive relief, restitution of consumers affected by a violation of the Act, a $10,000-per-day penalty, attorney fees, costs, and other relief. *Id.* § 10(c)(2)-(7). In such an action, a manufacturer or wholesale drug distributor "may not assert as a defense that [it] did not directly sell a product to a consumer residing in Illinois." *Id.* § 10(c).

**The Dismissal of AAM's Original Complaint**

In January 2024, AAM initiated this action, claiming that the Act violated the dormant Commerce Clause by regulating "prices charged in transactions wholly outside Illinois," as well as the Due Process Clause and the "horizontal separation of powers" among the States. Doc. 1 at 28-33. AAM alleged that some of its members had intended "to make competitively reasonable price adjustments to the wholesale acquisition cost" for certain generic drugs, but refrained from doing so because of "the Act's prohibition on their planned price increases." *Id.* at 15, 17.

A month later, AAM moved for a preliminary injunction based on its dormant Commerce Clause claim — specifically, its assertion that the Act unconstitutionally regulates extraterritorial transactions. Doc. 17 at 1; Doc. 18 at 14-22. In support of

its claim that its members would suffer irreparable harm, *see* Doc. 18 at 23, AAM cited a declaration from Timothy de Gavre, Sandoz's Chief Commercial Officer, stating that it intended to increase the price of one of the drugs it manufactured above the dollar and percentage thresholds set by the Act, Doc. 20 at 1, 4; *see* A171. Furthermore, de Gavre averred, a "majority" of that increase would be "attributable to factors other than" production costs or the costs of expanding access to that drug, including "regulatory approval costs, costs incurred due to product inventory loss, and inflation." A171. Yet de Gavre also emphasized that the "cost of manufacturing" this drug had recently "increased in multiple respects," including due to "production cost increases, product ingredient cost increases, increased costs associated with product validation (including inspection and testing), and changes to its active pharmaceutical ingredient that required additional expensive tests." A170. And de Gavre expected "significant new production hurdles" resulting in greater "overhead costs" in the future. A170-71.

The Attorney General filed a combined motion to dismiss the complaint and response to the preliminary injunction motion, arguing that AAM lacked standing, was unlikely to prevail on the merits, and failed to show irreparable harm or that the equities weighed in its favor. Doc. 26 at 18-38.

The district court granted the Attorney General's motion to dismiss and denied AAM's preliminary injunction motion, concluding that AAM failed to allege that it would suffer an injury-in-fact traceable to the Act's enforcement. Doc. 32 at 3. The court noted that AAM had alleged that its members' planned price increases

8

were "reasonable" and "necessary," such that they would not constitute price gouging under the Act.  *Id.*  Furthermore, AAM had alleged no facts suggesting that any of its members faced any "credible threat of prosecution," such as receiving a "notice of investigation" or being subject to "enforcement action."  *Id.*

**AAM's Amended Complaint**

AAM then filed an amended complaint, raising the same claims as its original complaint.  Doc. 34 at 32-36; *see* A176-213.  AAM added allegations intended to address the district court's conclusion that it had failed to plead an injury-in-fact, including that "[s]everal of [its] members located outside Illinois intend, or intended until the Act's adoption, to increase the wholesale acquisition cost for certain essential off-patent or generic drugs after January 1, 2024."  A191 (cleaned up).  According to AAM, those price increases would exceed the dollar and percentage thresholds set forth in the Act and were motivated "by factors other than an increase in the cost of producing the essential medicine or increased costs associated with expanding public access to the medicine," *id.*, including, "at least in part, . . . increasing profitability and shareholder value and offsetting price reductions on other products," A193.  AAM also alleged that there was a "substantial risk" that the Attorney General would deem "one or more of the[se] contemplated price increases" as "price gouging" under the Act, but did not allege that any of its members was subject to an investigation or enforcement action by the Attorney General.  A192.  And AAM incorporated some of the facts set forth in the de Gavre declaration

regarding Sandoz's planned price increase as an example of one of its members' alleged injuries. A193-94.

The Attorney General again moved to dismiss, arguing that AAM had not sufficiently alleged that any of its members would engage in a course of conduct proscribed by the Act or faced any imminent risk that it would be prosecuted for violating the Act. Doc. 39 at 13-17. The Attorney General argued that AAM still failed to allege facts showing that any of its members would increase prices in a way that would constitute price gouging under the Act, noting that it pled "no specific facts demonstrating how the vague justifications for the price increase, even if substantial, would render it excessive — *i.e.*, more than necessary — or unduly burdensome to consumers." *Id.* at 15. Furthermore, AAM did not add allegations suggesting that the Attorney General had investigated or attempted to enforce the Act against any of AAM's members. *Id.* at 16. Alternatively, the Attorney General argued that AAM's request for broad, facial relief as to the Act should be dismissed because AAM acknowledged that it had members located in Illinois, to which the Act could be applied without creating any dormant Commerce Clause issue. *Id.* at 18. And whether a particular price increase constituted price gouging would be a fact-intensive, case-by-case inquiry that would be unsuitable for resolution in a facial challenge. *Id.* at 18-19.

The district court denied the Attorney General's motion to dismiss, concluding that AAM had pleaded an injury-in-fact through its allegations regarding Sandoz's planned price increase. Doc. 46 at 3. According to the district court, AAM had

alleged that that price increase was "driven by various financial goals, including increasing or sustaining the company's profit margins," and so it would arguably constitute price gouging under the Act. *Id.* The court next concluded that AAM did not need to allege that it faced any threat of investigation or enforcement. *Id.* at 3-4. Finally, the court rejected the Attorney General's argument that AAM's requested relief was overbroad, concluding that AAM's claims were neither fact-bound nor dependent on the circumstances of any drug sale. *Id.* at 5.

**AAM's Renewed Preliminary Injunction Motion**

AAM then filed a renewed motion for a preliminary injunction solely premised on its claim that the dormant Commerce Clause prohibits "extraterritorial legislation." Doc. 52 at 16. According to AAM, it was likely to prevail on that claim because "extraterritorial state legislation" violates the dormant Commerce Clause, Doc. 52 at 23 (cleaned up), regardless of whether the state law is "discriminatory," Doc. 62 at 8. And according to AAM, the Act "regulates the prices manufacturers charge in transactions with *no* Illinois connection," despite the Act being limited to drugs "ultimately sold in Illinois." Doc. 52 at 21 (emphasis in original).

Next, AAM argued that it had shown that its members would suffer irreparable harm by being subjected to an unconstitutional law and by incurring "significant economic losses," citing a new declaration from Rodney Emerson, Sandoz's vice president of pricing and contracts. Doc. 52 at 24; *see* Doc. 54; A222-30.

Like de Gavre, Emerson described Sandoz's plan to increase the price of the same drug beyond the dollar and percentage thresholds set forth in the Act. A225.

11

And Emerson described the same "production cost increases" that de Gavre had, while alleging that the planned price increase was "attributable to factors other than an increase in the cost of producing" the drug. A224, A226. But according to Emerson, Sandoz "reevaluated" its plan in "the second half of calendar year 2024" and decided "not to proceed with the previously planned price increase for that product" unless the Act's enforcement was enjoined. A225. Emerson attested that, as a result of the plan's abandonment, "Sandoz will bring in less revenue this year and in future years" and could not "recoup that revenue" absent an injunction. A226. And Sandoz's "internal projections" showed that it would no longer be profitable to sell the drug absent the price increase. *Id.*

In response, the Attorney General argued that AAM was unlikely to succeed on the merits, noting that *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), had declined to read a broad extraterritoriality principle into the dormant Commerce Clause. Doc. 58 at 18-22. Instead, *Ross* clarified that the dormant Commerce Clause prohibited laws that favored in-state interests to the detriment of out-of-state interests, not all laws that had extraterritorial effects. *Id.* And the Act is nondiscriminatory, as it prohibits price gouging by all generic drug manufacturers or distributors that sell such drugs in Illinois, not only out-of-state manufacturers or distributors. *Id.* at 20. The Attorney General also preserved his argument that AAM lacked standing. *Id.* at 8.

As for irreparable harm, the Attorney General argued that AAM's alleged economic losses were insufficient to show that its business was in jeopardy such that

those losses could warrant immediate injunctive relief. *Id.* at 27. Furthermore, the Act did not cause any harm to AAM's members, as it offered no evidence that its members intended to engage in the "predatory pricing practices" prohibited by the Act. *Id.* at 27-28. And the equities weighed in the Attorney General's favor because the public interest would not be served by enjoining a duly enacted state law and would be served by allowing the Attorney General to "safeguard[ ] Illinois residents from abusing pricing tactics." *Id.* at 28.

The district court denied AAM's motion for preliminary injunction. A1. The court first concluded that AAM was unlikely to succeed on the merits of its "extraterritoriality argument" because the dormant Commerce Clause prohibits laws having extraterritorial effects if they are "discriminatory and protectionist." A10. Because the Act "regulates the price of drugs sold in Illinois, without regard for where they are manufactured," AAM could not show that it was discriminatory or motivated by protectionism. A8.

Addressing the other preliminary injunction factors, the district court determined that AAM had established irreparable harm through Emerson's declaration. A13-14. The district court determined that the equities weighed in the Attorney General's favor, however, because, despite the Act's effect on "corporate profits," AAM's interests were outweighed by the Attorney General's in enforcing a duly enacted state law and in promoting "the public's . . . affordable access to generic and biosimilar drugs." A15.

13

AAM appealed from the district court's order denying its preliminary injunction motion.  Doc. 88.

**SUMMARY OF ARGUMENT**

The Act does not prohibit pharmaceutical manufacturers or distributors from making reasonable price increases to their products. Instead, it targets only unconscionable and excessive price increases that affect Illinois consumers, are caused by insufficient competition in the marketplace, and cannot be reasonably justified by increased production costs or expanding access to a drug. Nevertheless, AAM sought to protect its members' ability to price-gouge Illinois consumers, seeking a pre-enforcement preliminary injunction that would prohibit the Act's enforcement as to any of its out-of-state members. And it did so based on a single example of one of its members' changed business plans that does not even fall within the Act's definition of price gouging.

This Court should affirm the district court's rejection of AAM's effort to defend unconscionable drug price increases for two reasons. First, AAM lacked standing because it failed to offer evidence that any of its members were subject to an imminent risk of prosecution under the Act. Indeed, AAM's sole evidence that its members would engage in prohibited price gouging came from a declaration by a Sandoz executive who clarified that Sandoz had *abandoned* its plan to increase the price of one of its drugs. And the declaration did not state that, if Sandoz had gone through with its plan, Sandoz would have violated the Act. On the contrary, and consistent with Sandoz's prior declaration submitted in this case, this declaration confirmed that the price increases would have been made for reasons considered legitimate under the Act. Furthermore, there was no evidence that the Attorney

15

General had initiated any investigation or enforcement action to redress a violation of the Act by any AAM member.

Second, as the district court held, AAM's preliminary injunction motion was premised on the same broad theory of "extraterritoriality" that the Supreme Court rejected in *Ross*. As *Ross* made clear, the "extraterritoriality" principle referred to by AAM is, in reality, a prohibition on state economic protectionism. But, as even AAM concedes, there is no protectionism here. The Act does not favor in-state pharmaceutical manufacturers or distributors to the detriment of out-of-state entities; rather, it prohibits price gouging by *any* manufacturer or distributor, whether in or outside Illinois. And even if, as AAM contends, the dormant Commerce Clause — as opposed to some other constitutional principle — prohibits extraterritorial regulation that is not motivated by state economic protectionism, AAM is still not likely to prevail because the Act only applies to drugs ultimately sold in Illinois, not transactions unconnected to the State.

Furthermore, AAM failed to establish that it would suffer irreparable harm without a preliminary injunction or that the equities weighed in its favor. AAM's only evidence of irreparable harm was that one of its members forewent a planned price increase out of fear that the Act might prohibit it. But that evidence did not clearly show that the Act actually would prohibit that price increase and, if it had, the inability to effectuate an unconscionable, unjustifiable price increase cannot be irreparable harm. And the district court did not abuse its discretion in weighing that

16

supposed harm against Illinois's strong interest in protecting its residents from pharmaceutical price gouging.

**ARGUMENT**

**I.**     **This court should review AAM's standing *de novo* and the denial of its preliminary injunction motion for an abuse of discretion.**

This court should review AAM's standing to seek injunctive relief *de novo*. *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012). AAM's "burden to demonstrate standing" to support its motion for preliminary injunction was "'at least as great as the burden of resisting a summary judgment motion.'" *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, n.8 (1990)). Thus, AAM had to "set forth by affidavit or other evidence specific facts" to show that the Act's enforcement against at least one of its members was sufficiently imminent, "rather than general factual allegations of injury." *Id.* (cleaned up).

This court "reviews the district court's denial of the motion for a preliminary injunction for an abuse of discretion, viewing its legal conclusions *de novo*, and findings of fact for clear error." *Ill. Tamale Co. v. LC Trademarks, Inc.*, 164 F.4th 648, 654 (7th Cir. 2026) (cleaned up). To obtain a preliminary injunction, AAM had to make a "clear showing" that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008).

**II.  AAM lacked standing because it failed to establish that its members would engage in price gouging proscribed by the Act or that the Act's enforcement was imminent.**

At the threshold, this court should uphold the district court's denial of AAM's request for preliminary injunctive relief because AAM failed to establish that it had standing to seek such extraordinary relief in this pre-enforcement challenge.  In particular, AAM failed to show that any of its members faced an imminent risk of harm, both because AAM did not indicate that any of its member intended to engage in prohibited price gouging and because AAM pointed to no credible threat that the Attorney General planned to enforce the Act against any of its members.

AAM asserted that it had associational standing to bring this action "on its members' behalf."  A182.  To establish associational standing, AAM had to show that one of "its members would otherwise have standing to sue in their own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (cleaned up).  Thus, on behalf of one of its members, AAM had to show:  "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (cleaned up).  The member's alleged injury had to be "certainly impeding" and "not . . . speculative." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (cleaned up).  A "possible future injury" would not suffice. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

Moreover, when, as here, a party brings a pre-enforcement challenge to a state law, it must point to "circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony*, 573 U.S. at 159; *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021) ("This Court has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court."). AAM could have satisfied this standard by establishing that one of its members intended "to engage in a course of conduct arguably affected by [the challenged statute], and that [the member] faces a credible threat the [statute] will be enforced against [it] when [it] does." *Speech First*, 968 F.3d at 638. But "the 'chilling effect' associated with a potentially unconstitutional law being 'on the books' is insufficient to 'justify federal intervention' in a pre-enforcement suit." *Whole Woman's Health*, 595 U.S. at 50 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)). On the contrary, the Supreme Court "has always required proof of a more concrete injury and compliance with traditional rules of equitable practice," whether "the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right." *Id.*

AAM failed to make the required showing here. Its sole evidence supporting its preliminary injunction motion indicated that one of its members "decided *not* to proceed with [a] previously planned price increase" that, according to AAM, would have violated the Act. A225 (emphasis added). And although its amended complaint alleged that "some AAM members . . . intend[ed] to implement previously planned increases," A192, it could not rest on that allegation to meet its burden of

20

establishing standing to seek a preliminary injunction, *see Speech First*, 968 F.3d at 638 (party seeking preliminary injunction must present "affidavit or other evidence" containing "specific facts" to support standing, not merely "general factual allegations of injury" (cleaned up)).  Nor could AAM vaguely assert that some of its members intended to engage in price gouging — AAM had to "'identify members who have suffered the requisite harm.'"  *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1009 (7th Cir. 2021) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).  AAM thus failed to show that any specific member intended "to engage in a course of conduct . . . proscribed by" the statute they sought to challenge.  *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (cleaned up); *see Ind. Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023) ("It is a threshold requirement to establish a credible threat of enforcement that the statute actually cover the plaintiff's desired conduct.").

Although AAM alleged that Sandoz and other unidentified AAM members "lost revenues" by "refraining from raising their prices," A195, a party "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending," *Clapper*, 568 U.S. at 416; *see id.* at 415-16 (plaintiffs failed to establish standing based on their taking "costly and burdensome measures" based on "fear of surveillance," even if that fear was "nonparanoid").  And for at least two reasons, AAM failed to offer evidence that any of its members abandoned a planned price increase to avoid a certainly impending harm caused by the Act.

First, although Emerson attested that Sandoz abandoned it planned price increase because it feared incurring "significant penalties and other monetary liability" under the Act, A225, there was no evidence that "the Attorney General . . . ha[d] taken even a single step along the path to enforcement" to substantiate that fear, *Sweeney*, 990 F.3d at 560.  The Act took effect on January 1, 2024, 410 ILCS 725/99, and the Attorney General was aware of Sandoz's planned price increase in February 2024, when AAM filed the de Gavre declaration in this action, *see* Doc. 20 at 1-8.  Sandoz then abandoned its price increase "[i]n the second half" of that year, A225.  Yet there was no evidence that, in that time, the Attorney General had requested any information from Sandoz pursuant to the Act.  *See* 410 ILCS 725/10(b) (authorizing Attorney General to "send a notice to the manufacturer or the wholesale drug distributor requesting" information).  Nor was there any evidence that the Attorney General had initiated an action to compel the disclosure of information from Sandoz, let alone to hold it liable for violating the Act.  *See id.* § 10(c). Whatever "chilling effect" the Act may have had on Sandoz's pricing decisions, AAM could not establish standing based on the mere "'fear'" that the Attorney General "'might in the future take some *other* and additional action detrimental'" to Sandoz. *Clapper*, 568 U.S. at 417-18 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)) (emphasis in original).

Second, the Emerson declaration failed to demonstrate that the price increase Sandoz abandoned would have violated the Act, such that Sandoz's fear of enforcement was well-founded.  Under the Act, unlawful "price gouging" is an

22

"unconscionable increase in a prescription drug's price that" *both*: (1) exceeds certain dollar and percentage thresholds; *and* (2) "is otherwise excessive and unduly burdens consumers because of the importance of the essential off-patent or generic drug to their health *and* because of insufficient competition in the marketplace." 410 ILCS 725/5 (emphasis added). Nor does price gouging occur when an increase in a drug's price "can be reasonably justified by" *either*: (1) "an increase in the cost of producing the" drug; *or* (2) "the cost of appropriate expansion of access to" to the drug "to promote public health." *Id.*

Although Emerson's declaration indicated that Sandoz had planned a price increase for one drug that would have exceeded the Act's dollar and percentage thresholds, *see* A225, he offered no facts suggesting that the planned increase would cause an excessive and undue burden on consumers because of insufficient competition in the marketplace. Emerson noted that Sandoz "struggled to meet demand" for the drug, but did not specify that consumer demand for this drug could not be met by its competitors. A224. Indeed, in the de Gavre declaration AAM submitted a year earlier, it stated that this drug was in short supply, A170, yet that assertion is tellingly absent from Emerson's declaration, A224, suggesting that there was no longer a general supply shortage. Furthermore, Emerson stressed that disclosing the drug's name or its pricing decision would harm Sandoz's "competitive position" by allowing its "competitors . . . the opportunity to make adjustments to their own pricing or other business strategies in response to Sandoz's non-public pricing plans." A227. Thus, AAM's evidence suggested that competition over this

23

drug was robust, such that consumers might have access to a lower-priced option from Sandoz's competitor.

Additionally, the Emerson declaration failed to establish that the planned price increase was not "reasonably justified" by increased production cost. 410 ILCS 725/5. Indeed, Emerson emphasized the "expensive" process of "producing" the drug and noted that "the cost of manufacturing" it had "increased" in recent years. A224. And Emerson expected these costs to further increase in the future. *See* A225 ("As a result, Sandoz has faced and expects in the future to face significant new production hurdles requiring increased processes and investment at almost every stage of production.").

Although Emerson offered the conclusory statement that a "majority" of the planned price increase was "attributable to factors other than an increase in" production cost, citing "regulatory approval costs," "product inventory loss," and "inflation," A226, he did not attempt to square that assertion with his comments about the ever-increasing cost of producing this drug, *see* A224-25. Nor did AAM try to explain why costs associated with seeking approval from unspecified regulators, inventory loss, or inflation would not be considered increases "in the cost of producing" the drug or related to "appropriate expansion of access" to the drug. 410 ILCS 725/5. If anything, paying to seek approval of a drug, lost product, and increased costs of materials, wages, and other inputs due to inflation likely would relate to either the cost of producing a drug or expanding access to it.

24

Thus, Sandoz's choice to abandon a price increase was not caused by the Act's imminent enforcement, but rather its subjective fear that the Act "could subject Sandoz to substantial liability." A228. But such "[a]rguments couched in 'coulds,' 'maybes,' and 'ifs' are far too speculative to support standing to sue for prospective relief." *Arcidiacono v. Whitehorn*, 178 F.4th 338, 345 (7th Cir. 2026). This court should thus affirm the denial of AAM's preliminary injunction motion for lack of standing.

### III. Lack of standing aside, the district court correctly denied AAM's preliminary injunction motion.

Even if this court concludes that AAM had standing to seek injunctive relief, this court should affirm the district court's denial of its preliminary injunction motion. "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (cleaned up). Thus, a plaintiff seeking a preliminary injunction must make a "clear showing" that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 22. This is a "significant burden." *Grubhub Inc. v. Relish Labs, LLC*, 80 F.4th 835, 844 (7th Cir. 2023) (cleaned up). The plaintiff "need not show that it will definitely win the case," but "must demonstrate at a minimum how it proposes to prove the key elements of its case." *Id.* at 844 (cleaned up). As explained below, AAM failed to make a clear showing as to any of the essential elements of its extraordinary request for relief.

## A. AAM is unlikely to prevail on its dormant Commerce Clause claim.

The district court correctly held that AAM was unlikely to prevail on its dormant Commerce Clause claim because the Act does not discriminate against "out-of-state interests." A8. As the Supreme Court recently made clear, the dormant "Commerce Clause prohibits the enforcement of state laws driven by economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Ross*, 598 U.S. at 369 (cleaned up). Accordingly, a state law may violate the dormant Commerce Clause when: (1) "on its face," it discriminates against interstate commerce by benefiting "in-state . . . economic interests" while burdening "out-of-state economic interests," *United Haulers Ass'n v. Oneida-Herkimer Solid Wast Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (cleaned up); or (2) under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits," *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338-39 (2008) (cleaned up). In either case, "antidiscrimination" lies at the "core" of the dormant Commerce Clause. *Ross*, 598 U.S. at 369 (cleaned up); *see also id.* at 377 (noting that *Pike* test evaluates whether "a law's practical effects . . . disclose the presence of a discriminatory purpose"); *id.* at 391-92 (Sotomayor, J., concurring in part) (noting that a "small number" of cases have invalidated "genuinely nondiscriminatory laws" under *Pike*, but *Pike* is "most frequently deployed to detect the presence or absence of latent economic protectionism" (cleaned up)).

Here, AAM does not argue that the Act explicitly discriminates against out-of-state businesses in favor of in-state interests. *See* AT Br. 29-60. Nor could it — the Act equally prohibits price gouging by drug manufacturers and distributors in and outside Illinois. *See* 410 ILCS 725/10(a). AAM also disavowed any claim based on *Pike* balancing for purposes of its preliminary injunction motion. *See* A131 (conceding at oral argument that "*Pike* balancing" is "not the kind of claim that [AAM was] presenting"); *Speech First*, 968 F.3d at 642 (on appeal from denial of preliminary injunction, party "waived . . . argument" it did not raise "before the district court").

Instead, like the plaintiffs in *Ross*, AAM rested its request for a preliminary injunction on "the extraterritoriality doctrine." A124; *see Ross*, 598 U.S. at 371 ("petitioners invoke what they call extraterritoriality doctrine" (cleaned up)). According to AAM, despite the absence of any discriminatory purpose or effect, the Act violates this doctrine because it "directly regulates wholly out-of-state transactions." AT Br. 30. As explained below, however, AAM misstates the dormant Commerce Clause's reach and misconstrues the Act's scope.

### 1. AAM's extraterritoriality claim will fail because the Act does not discriminate in favor of in-state interests.

As the district court recognized, the Supreme Court clarified the scope of its "extraterritoriality" precedent in *Ross*. A5 (cleaned up). In *Ross*, the plaintiffs asserted that three cases — *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986), and *Healy v. Beer Inst.*, 491 U.S. 324 (1989) — added a third strand to the dormant

27

Commerce Clause doctrine (in addition to the antidiscrimination principle and *Pike* balancing) under which state laws are invalid if they control commerce "occurring wholly outside the boundaries of the State." *Ross*, 598 U.S. at 373 (cleaned up). But *Ross* rejected this third strand, stating that the plaintiffs had "read too much into" *Baldwin, Brown-Forman*, and *Healy*, which merely "typifie[d] the familiar concern with preventing purposeful discrimination against out-of-state economic interests." *Id.* at 371, 373; *see also id.* at 394 (Roberts, C.J., concurring in part and dissenting in part) (agreeing with majority's interpretation of *Baldwin*, *Brown-Forman,* and *Healy*).

As *Ross* explained, *Baldwin* addressed a New York law that "barred out-of-state dairy farmers from selling their milk in the State 'unless the price paid to' them matched the minimum price New York law guaranteed in-state producers." *Id.* at 371-72 (quoting *Baldwin*, 284 U.S. at 519). That law thus "operated as a tariff or customs duty" that protected a "major local industry against competition from without the State." *Id.* at 372 (cleaned up). Likewise, *Brown-Forman* invalidated a New York law that imposed "'simple economic protectionism'" by requiring "liquor distillers to affirm . . . that their in-state prices were no higher than their out-of-state prices," thus forcing "out-of-state distillers to 'surrender' whatever cost advantages they enjoyed." *Id.* (quoting *Brown-Forman*, 476 U.S. at 580). And *Healy* addressed a price-affirmation statute that, like the law challenged in *Brown-Forman*, applied "'solely to interstate' firms, and in that way 'clearly discriminate[d] against interstate commerce.'" *Id.* at 373 (quoting *Healy*, 491 U.S. at 340-41).

By contrast, the Act has no similar protectionist intent or effect.  Unlike the laws addressed in *Baldwin*, *Brown-Forman*, and *Healy*, the Act does not tie prices of drugs sold by in-state manufacturers or distributors to those sold by out-of-state manufacturers or distributors.  Instead, the Act prohibits any "price gouging in the sale of an essential off-patent or generic drug that is ultimately sold in Illinois," regardless of the manufacturer or distributor's location.  410 ILCS 725/10(a).  Thus, it does not engage in the "purposeful discrimination against out-of-state economic interests" that the dormant Commerce Clause prohibits.  *Ross*, 598 U.S. at 371.

Nor does AAM's allegation that the "vast majority of sales" between its manufacturer and distributor members "occur outside Illinois" suggest that the Act is motivated by protectionism.  A188.  Indeed, in *Ross*, the Supreme Court upheld a California law prohibiting the in-state sale of pork derived from pigs raised in cruel conditions even though "California import[ed] almost all of the pork it consume[d]."  598 U.S. at 367.  Thus, the fact that most of the drugs sold in Illinois originate from sales occurring outside the State does not demonstrate that the Act discriminates against interstate commerce.

For its part, AAM does not ascribe any protectionist intent or effects to the Act, instead asserting that *Baldwin*, *Brown-Forman*, and *Healy* stand for the proposition that the dormant Commerce Clause prohibits regulation of "commerce that takes place wholly outside of the State's borders."  AT Br. 35-36 (cleaned up).  But this is the same language into which the plaintiffs in *Ross* "read too much."  598 U.S. at 373.  As *Ross* explained, that language "appeared in a particular context and

did particular work," highlighting the "*specific* impermissible extraterritorial effect" of depriving out-of-state businesses of a competitive advantage to the benefit of in-state interests. *Id.* at 374 (cleaned up and emphasis in original). This court should reject AAM's effort to broaden the scope of *Baldwin*, *Brown-Forman*, and *Healy* beyond the nondiscrimination principle they reflect.[7]

AAM also places too much weight on a footnote in *Ross* distinguishing the plurality opinion in *Edgar v. MITE Corp.*, 457 U.S. 624 (1982). AT Br. 41. In that footnote, the Court distinguished *Edgar* because, unlike the California animal-cruelty law in *Ross*, *Edgar* "spoke to a law that *directly* regulated out-of-state transactions by those with *no* connection to the State." 598 U.S. at 376 n.1 (emphases in original). According to plaintiffs, this footnote "underscored that nothing in [the Court's] opinion should be read to validate state laws . . . that *directly* regulate out-of-state parties' out-of-state conduct." AT Br. 40 (emphasis in original).

But far from endorsing *Edgar* as reflecting a broad extraterritoriality principle housed within the dormant Commerce Clause, the Court in *Ross* "questioned

---

[7] Unlike AAM, its *amicus curiae* the U.S. Chamber of Commerce contends that the Act "reflects economic protectionism" because it "targets sales from manufacturers and distributors," but not "Illinois-based pharmacies" or other participants in the drug supply chain that are located in Illinois. 7th Cir. Doc. 25 at 29-30. The Chamber of Commerce misunderstands the meaning of protectionism. The dormant Commerce Clause prohibits "economic protectionism" in the form of "regulatory measures designed to *benefit in-state economic interests* by burdening out-of-state *competitors*." *Ross*, 598 U.S. at 369 (cleaned up and emphases added). By its terms, the Act cannot benefit any in-state drug manufacturer or distributor because it prohibits price gouging by such entities. *See* 410 ILCS 725/10(a). The fact that most drug manufacturers and distributors are located in States other than Illinois does not demonstrate economic protectionism. *See* Doc. 34 at 4 (noting that AAM has two Illinois-based drug manufacturer members); *supra* p. 29.

whether the state law at issue in *Edgar* posed a dormant Commerce Clause question as much as one testing the territorial limits of state authority under the Constitution's horizontal separation of powers." 598 U.S. at 376 n.1. Here, AAM relied solely on the dormant Commerce Clause in seeking injunctive relief, expressly waiving any reliance on its "horizontal separation of powers" claim. *See infra* pp. 44-46. And, in any event, the *Edgar* plurality opinion's suggestion that the dormant Commerce Clause prohibits "extraterritorial regulation . . . did not garner support from a majority of the Court." *Alliant Energy Corp. v. Bie*, 336 F.3d 545, 547 (7th Cir. 2003). Instead, the Court's majority held that the challenged law violated the dormant Commerce Clause under *Pike* balancing. *See id.* But AAM also waived any *Pike* balancing argument for purposes of its preliminary injunction motion. *See supra* p. 27.

The district court thus rightly concluded that, contrary to AAM's argument, *Edgar* provides, at best, "murky" support for the proposition that "the dormant Commerce Clause prohibits nondiscriminatory state laws that directly regulate out-of-state commerce." A8. Accordingly, AAM's decision to "rely entirely on the *Edgar* plurality" in seeking a preliminary injunction, *see id.*, was insufficient to make a "*clear showing* that [it was] likely to succeed on the merits" of its dormant Commerce Clause claim, *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (cleaned up and emphasis added). This court should uphold the district court's conclusion that AAM failed to show it was likely to prevail on the merits of its dormant Commerce Clause claim.

### 2. AAM's extraterritoriality claim will fail even if it does not have to show that the Act discriminates against out-of-state interests in favor of in-state interests.

Even if, as AAM argues, the dormant Commerce Clause prohibits nondiscriminatory state laws that "*directly* regulate[ ] out-of-state transactions by those with *no* connection to the State," AT Br. 41 (quoting *Ross*, 598 U.S. at 376 n.1 (emphases in original)), the Act does no such thing. By its terms, it applies only to price gouging as to drugs "ultimately sold in Illinois." 410 ILCS 725/10(a). Thus, the Act is expressly limited to regulating transactions that have a connection to Illinois.

In that way, the Act does not resemble the law at issue in *Edgar*, which regulated takeover offers made for corporations that met two of three conditions: their principal executive offices were located in Illinois, they were organized under Illinois law, or they had "at least 10% of [their] stated capital and paid-in surplus represented within the State." 457 U.S. at 627; *see* AT Br. 34-37. These offers were communicated "to shareholders across the country and abroad," and, as a result, the challenged law regulated offers not only to "stockholders living in Illinois, but also [to] those living in other States and having no connection with Illinois." *Edgar*, 457 U.S. at 641-42. Accordingly, the *Edgar* plurality explained, the law "could be applied to regulate a tender offer which would not affect a single Illinois shareholder." *Id.*

That is not possible under the Act. By limiting its price-gouging prohibition to drugs "ultimately sold in Illinois," 410 ILCS 725/10(a), the Act limits its reach to those drugs that are "eventually sold in Illinois," A188. Although manufacturers or distributors cannot avoid that prohibition by asserting that they did not "*directly* sell

32

a product to a consumer residing in Illinois," 410 ILCS 725/10(a) (emphasis added), liability may only attach if the drug is sold in Illinois. Thus, the Act does not regulate a transaction involving those with "*no* connection to the State." *Ross*, 598 U.S. at 376 n.1 (emphasis in original); *see CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93 (1987) (upholding Indiana law governing tender offers because, unlike law in *Edgar*, "every application of the Indiana Act will affect a substantial number of Indiana residents, whom Indiana indisputably has an interest in protecting").

Nevertheless, according to AAM, so long as a drug's price was first unconscionably increased in an "out-of-state transaction[ ] *up* the chain" of commerce, the dormant Commerce Clause renders Illinois powerless to protect its residents from that increase when the drug is later sold in the State. AT Br. 53 (emphases in original). Under AAM's view, then, drug manufacturers and distributors would be given "an incentive to avoid physical presence" in Illinois to gain protection of the dormant Commerce Clause's supposed prohibition on extraterritoriality, while reaping excessive profits from price gouging directed at, and ultimately affecting, residents in the State. *See South Dakota v. Wayfair*, 585 U.S. 162, 179 (2018). But "it is certainly not the purpose of the Commerce Clause to permit the Judiciary to create market distortions." *Id.* at 178-79. This court should avoid reading the dormant Commerce Clause as sheltering such gamesmanship. *See, e.g., id.* at 179 (rejecting interpretation of dormant Commerce Clause that would "serve as a judicially created tax shelter for businesses that decide to limit their physical presence and still sell their goods and services to a State's consumers").

AAM's comparison of the Act to state laws invalidated in *Davis v. Farmers Co-Op. Equity Co.*, 262 U.S. 312 (1923), *Shafer v. Farmers' Grain Co. of Embden*, 268 U.S. 189 (1925), and *Shaffer v. Heitner*, 433 U.S. 186 (1977), also is misplaced. AT Br. 34. *Davis* involved a Minnesota statute that required any corporation with an agent in the State "to submit to suit" in Minnesota, without any requirement that the suit "aris[e] out of business transacted within Minnesota" or that the plaintiff be "a resident of the [S]tate." 262 U.S. at 315. By contrast, the Act applies only to instances in which Illinois residents were harmed by price gouging.[8]

Similarly, in *Shaffer*, the Supreme Court held that a Delaware law that allowed its courts "to take jurisdiction of a lawsuit by sequestering any property of the defendant that happen[ed] to be located in Delaware" violated the Due Process Clause. 433 U.S. at 189. Here, AAM waived its due process claim for purposes of its preliminary injunction motion by abandoning that claim in the district court. *See* A124 (AAM's acknowledgement that its preliminary injunction motion was solely premised on dormant Commerce Clause); *Speech First*, 968 F.3d at 642 (on appeal from denial of preliminary injunction, party "waived . . . argument" it did not raise "before the district court"). And the Act does not purport to extend Illinois courts' jurisdiction over out-of-state companies that "simply had nothing to do with the State." *Shaffer*, 433 U.S. at 216. Instead, it regulates price gouging that harms

---

[8] *Davis* also involved an interpretation of the dormant Commerce Clause that was "swept away and then largely forgotten after" the Court grounded the issue of personal jurisdiction in the Due Process Clause in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). Stephen E. Sachs, *Dormant Commerce and Corporate Jurisdiction*, 2023 Sup. Ct. Rev. 213, 214-15 & n.13 (2023).

Illinois residents, whom it "indisputably has an interest in protecting." *CTS*, 481 U.S. at 93.

As for *Shafer*, that case involved a North Dakota law that extensively regulated the price, grading process, and other aspects of wheat purchases in the State for sale out of state. 268 U.S. at 194-98. But the Court's analysis, which emphasized the burdens of North Dakota's law as opposed to its supposed benefits, *see id*. at 199-202, resembled *Pike* balancing, a claim that AAM waived for purposes of its preliminary injunction motion. *See supra* p. 27; *see also Pike*, 397 U.S. at 142 (citing *Shafer* as a case in which the Court examined the "effects and burdens" of a state law on interstate commerce). Regardless, the Act does not so pervasively regulate pharmaceutical companies to render it comparable to the North Dakota law invalidated in *Shafer* — the Act instead targets a narrowly defined form of price gouging to foster "accessibility of . . . life-saving medications" in Illinois. 410 ILCS 725/2(e); *see Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806 (1976) (describing law in *Shafer* as an effort "by North Dakota to regulate and thus disrupt the interstate market in grain by imposing burdensome regulations upon and controlling the profit margin of corporations that purchased grain in State for shipment and sale outside the State").

### 3. This court's pre-*Ross* precedent does not compel a different result.

Unable to demonstrate that its extraterritoriality theory is viable under current Supreme Court precedent, AAM next turns to this court's pre-*Ross* precedent. AT Br. 30-34. But the cases it cites involved state laws that were

meaningfully different from the Act.  And given *Ross*, those decisions should not be read as suggesting that the dormant Commerce Clause broadly prohibits state laws with extraterritorial effects that lack a discriminatory purpose.

Unlike the Act, the laws at issue in these cases either regulated activities occurring entirely outside a State's borders, with no connection to the State enacting the laws, or were enacted for protectionist reasons.  For example, in *Legato Vapors, LLC v. Cook*, 847 F.3d 825 (7th Cir. 2017), this court invalidated an Indiana statute regulating the security and sanitation of e-cigarette manufacturing facilities, whether "'located inside or outside Indiana.'"  *Id.* at 828 (quoting Ind. Code § 7.1-7-2-15).  In invalidating the law, the court emphasized that it amounted to a "direct" regulation of out-of-state "production facilities and their purchases of services in their home state" and that some of its provisions "raise[d] obvious concerns about protectionist purposes" because they looked "very much like a legislative grant of a monopoly to one favored in-state company in the security business."  *Id.* at 833-34.  In *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010), this court addressed an Indiana statute that regulated consumer loans made by financial institutions that "advertised or solicited sales, leases, or loans in Indiana by any means" — even if those sales, leases, or loans occurred entirely outside Indiana — as applied to title loan transactions made by an Illinois company in its Illinois offices, *id.* at 662 (cleaned up).  And in *Dean Foods Co. v. Brancel*, 187 F.3d 609, 611 (7th Cir. 1999), this court invalidated a milk-pricing regulation that was intended to "stem th[e] tide"

of lost dairy farms in Wisconsin by prohibiting payments to larger, out-of-state farms and to protect the "future viability" of "smaller in-state processors."

Unlike those laws, the Act does not regulate conduct untethered to the State, nor does it protect in-state industries at the expense of out-of-state businesses. It prohibits price gouging as to drugs "ultimately sold in Illinois," 410 ILCS 725/10(a), not practices at out-of-state manufacturing facilities for the purpose of benefitting an in-state firm, *see Legato Vapors*, 847 F.3d at 832-36. Nor does it regulate a discrete transaction occurring wholly outside the State or for an expressly protectionist purpose, like laws at issue in *Midwest Title Loans* and *Dean Foods*. Indeed, as explained *supra* pp. 27-30, it evenhandedly prohibits price gouging by either in-state or out-of-state interests without any effects suggesting that it was motivated by protectionism.

To be sure, *Legato Vapors*, *Midwest Title Loans*, and *Dean Foods* also include language that could suggest that the dormant Commerce Clause includes a broad prohibition on extraterritorial regulation. *See*, *e.g.*, *Legato Vapors*, 847 F.3d at 836 (regulation of out-of-state, e-tobacco manufacturing facilities was "impermissible extraterritorial regulation" because it could affect manufacturers' contracts with out-of-state distributors); *Midwest Title Loans*, 593 F.3d at 665 (under dormant Commerce Clause, "nondiscriminatory local regulations" are "invalidated without a balancing of local benefit against out-of-state burden" when they "actually attempt to regulate activities in other states"); *Dean Foods*, 187 F.3d at 615 ("There is a long line of cases holding that states violate the Commerce Clause by regulating or

37

controlling commerce occurring wholly outside their own borders.").  But this court

principally cited *Healy*, *Brown-Forman*, and *Baldwin* to support those statements.

*See Legato Vapors*, 847 F.3d at 836; *Midwest Title Loans*, 593 F.3d at 665-66; *Dean*

*Foods*, 187 F.3d at 614-16.

As explained *supra* pp. 27-28, *Ross* clarified that *Healy*, *Brown-Forman*, and

*Baldwin* only prohibit state laws that have the "*specific* impermissible

extraterritorial effect" of disadvantaging out-of-state interests in favor of in-state

interests.  *Ross*, 598 U.S. at 374 (emphasis in original).  In light of *Ross*, therefore,

this court should read *Legato Vapors*, *Midwest Title Loans*, and *Dean Foods* to

incorporate the full meaning of these Supreme Court decisions, and not as broadly

prohibiting nondiscriminatory state legislation having extraterritorial effects.

AAM's citation to *In re Brand Name Prescription Drugs Antitrust Litig.*, 123

F.3d 599 (7th Cir. 1997), *abrogated in part on other grounds Rivet v. Regions Bank of*

*La.*, 522 U.S. 470 (1998), AT Br. 30, is even further afield.  That case did not even

involve a dormant Commerce Clause challenge.  Rather, this court referred to that

clause when addressing the propriety of removing to federal court a class action

brought by retail pharmacies against drug manufacturers and wholesalers under

Alabama's antitrust laws.  *Id.* at 602-04.  This court explained that the litigation had

"enough potential merit as an Alabama antitrust suit to defeat the application of the

'artful pleading' doctrine," requiring remand to state court, and added that, even if

applying state law to transactions unconnected to Alabama might raise Commerce

Clause issues, there were a "nontrivial number" of sales "from other states to

pharmacies in Alabama" that fell within the "intended and permissible scope of the statute." *Id.* at 613; *see also Rivet*, 522 U.S. at 475 ("The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim."). For all the reasons explained *supra* pp. 26-35, a passing reference to the dormant Commerce Clause in a removal case cannot support AAM's broad extraterritoriality rule post-*Ross*, much less the notion that the Act regulates activity unconnected to Illinois.

But even if the dormant Commerce Clause required that, regardless of protectionism, regulated transactions be sufficiently connected to Illinois, AAM's challenge would not provide a suitable vehicle to address whether, and in which instances, the Act runs afoul of that standard. Here, unlike in the context of an as-applied challenge to an actual or threatened enforcement action, the record contains only conclusory assertions about certain transactions occurring "outside Illinois." A188, A223. But whether regulated conduct occurs out-of-state is difficult to address in the abstract, without any evidence showing, for example, where the transaction was negotiated and finalized, where the manufacturing and distribution centers are located, and how much of the product will be sold in Illinois. *See Legato Vapors*, 847 F.3d at 836 (declining to invalidate portions of Indiana law applicable to certain conduct on which record was "not well developed"). This is especially true since AAM never asserted the Act is unconstitutional in *all* instances; on the contrary, AAM admits that the Act can be applied constitutionally against its members in many circumstances. *See* AT Br. 53-54 ("AAM did not seek to enjoin any . . . in-state

transactions"); *see also, e.g.*, A223 (Sandoz declaration admitting that it "sells its products to hospital systems, physicians, or specialty pharmacies with a physical presence in Illinois"). Given the lack of evidence that would allow this court to draw an effective line between constitutional and unconstitutional applications of the Act with any specificity, this court should conclude that AAM failed to clearly show that it was likely to succeed on its sweeping request for relief.

### 4. AAM's reliance on other circuits' precedent is unpersuasive.

AAM next turns to cases from the Fourth and Eighth Circuits that addressed other States' anti-price-gouging laws. AT Br. 42-43, 47-48. But neither supports AAM's argument.

In *Association for Accessible Meds. v. Frosh*, 887 F.3d 664 (4th Cir. 2018), the Fourth Circuit invalidated a Maryland law that prohibited price gouging as to any drugs "made available for sale" in Maryland, *id.* at 666 (cleaned up). According to the Fourth Circuit, that "'made available for sale' language [did] not limit the Act's application to sales that actually occur[red] within Maryland, nor [did] it restrict the Act's operation to the context of a resale transaction with a Maryland consumer." *Id.* at 671. Accordingly, the Maryland law regulated sales that occurred "entirely outside Maryland's borders." *Id.* By contrast, the Act is expressly limited to drugs ultimately sold in Illinois, thus avoiding any regulation of a transaction with "*no* connection" to the State. *Ross*, 598 U.S. at 376 n.1 (emphasis in original).

And although the Fourth Circuit stated that the Maryland law would violate the dormant Commerce Clause even if it "require[d] a nexus to an actual sale in

Maryland," that *dicta* cannot stand in light of *Ross*. 887 F.3d at 671. In making that statement, the Fourth Circuit, citing *Baldwin*, *Brown-Forman*, and *Healy*, reasoned that the Maryland law attempted "to dictate the price" that could be charged for generic drugs, even though it did *not* "aim to tie the prices charged for prescription drugs in Maryland to the prices at which those drugs are sold in other states." *Id.* at 672. But in *Ross*, the Court clarified that *Healy* and *Brown-Forman* addressed "price control or price affirmation statutes that *tied the price of in-state products to out-of-state prices*." 598 U.S. at 374 (cleaned up and emphasis added).

Nor did the Court in *Ross* cite *Frosh* "as correctly understanding and applying its precedent," as AAM asserts. AT Br. 42. To the contrary, *Ross* merely cited *Frosh* as further support for the notion that *Baldwin* and *Healy* prohibited "price control or price affirmation statutes that tie[ ] the price of in-state products to out-of-state prices." 598 U.S. at 374 (cleaned up). Nothing in *Ross* endorsed the Fourth Circuit's application of dormant Commerce Clause precedent to the Maryland law at issue in that case.

AAM also cites *Association for Accessible Meds. v. Ellison*, 140 F.4th 957 (8th Cir. 2025), but as the district court recognized, the Eighth Circuit's reasoning in that case is unpersuasive, *see* A9-10. There, as here, AAM sought a preliminary injunction to protect its members' ability to price-gouge Minnesota consumers by challenging a law similar to the Act. 140 F.4th at 959. The Eighth Circuit held that the Minnesota law "tie[d] the price of in-state products — prescription drugs — to the price that out-of-state manufacturers charge their wholesalers," and so was similar to the price-

41

control laws invalidated in *Baldwin* and *Healy*. *Id.* at 961. And, the Eighth Circuit reasoned, its holding was consistent with *Ross* because *Ross* "preserv[ed]" the Court's "precedent that a state violates the extraterritoriality principle when it enacts 'price control or price affirmation statutes that tie[ ] the price of in-state products to out-of-state prices.'" *Id.* at 960 (quoting *Ross*, 598 U.S. at 374).

The Eighth Circuit's reasoning was mistaken. As *Ross* explained, *Baldwin* and *Healy* addressed "a *specific* impermissible extraterritorial effect" — namely, deliberately preventing "out-of-state firms from undertaking competitive pricing" or depriving them of other "competitive advantages" *as compared to in-state firms*. 598 U.S. at 374 (cleaned up and emphasis in original); *see id.* at 369 (dormant Commerce Clause prohibits "economic protectionism" in the form of "regulatory measures designed to *benefit in-state economic interests* by burdening out-of-state competitors" (cleaned up and emphasis added)).

Unlike those laws, the Minnesota law addressed in *Ellison*, like the Act, did not place out-of-state drug manufacturers or distributors at any disadvantage as compared to those operating in Minnesota. Indeed, it prohibited unconscionable price increases for drugs "'sold, dispensed, or delivered to any consumer in'" Minnesota, whether they were manufactured outside or inside the State. 140 F.4th at 959 (quoting Minn. Stat. § 62J.842 subd. 1). Thus, the Eighth Circuit's conclusion that, like the laws in *Baldwin* and *Healy*, the Minnesota law impermissibly "tie[d]" in-state drug prices to out-of-state drug prices was incorrect and, like the district court, this court should not follow it. *Id.* at 961.

For its part, the Chamber of Commerce cites several other out-of-circuit cases, none of which supports AAM's dormant Commerce Clause claim. 7th Cir. Doc. 25 at 16 n.2. If anything, the cited Second and Ninth Circuit decisions undercut AAM's claim that the Act violates that clause by regulating activity that lacks a connection to Illinois. *See Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 116 (2d Cir. 2025) (statute permissibly "regulat[ed] conduct that . . . ha[d] a connection to New York" by prohibiting acts by gun industry members contributing to dangerous conditions in New York, even though statute lacked "a requirement that the subject gun industry member does business in New York"); *Flynt v. Bonta*, 131 F.4th 918, 930-31 (9th Cir. 2025) (California law did not "violate any dormant Commerce Clause command" even though it "condition[ed] a state license for conducting in-state activities on plaintiffs foregoing certain business interests, whether within or outside the state"). The Chamber's remaining cases are district court decisions that lack "precedential authority," *Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998), and, in any event, are inapposite.[9]

---

[9]  *See, e.g.*, *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1214 (N.D. Cal. 2025) *reversed in part on other grounds* 170 F.4th 744 (9th Cir. 2026) (plaintiff failed to bear burden in seeking preliminary injunction under dormant Commerce Clause because its briefing "compris[ed] approximately one page"); *Mosaic Fin. Ltd. v. Mut. S'holder Servs., LLC*, 767 F. Supp. 3d 619, 659 (N.D. Ohio 2025) (denying motion to dismiss Ohio securities law claims on extraterritoriality grounds where defendants' alleged actions had "a nexus to Ohio"); *Ass'n for Accessible Meds. v. Bonta*, 766 F. Supp. 3d 1020, 1033 (E.D. Cal. 2025) (invalidating California law designating certain settlement agreements between brand-name and generic pharmaceutical companies as anticompetitive, where "none of the parties, the agreement, or the pharmaceutical sales have any connection with California"); *Nat'l Shooting Sports Found., Inc. v. Bonta*, 718 F. Supp. 3d 1244, 1256 (S.D. Cal. 2024) (enjoining nuisance law that

Recognizing the tenuousness of its dormant Commerce Clause claim, AAM also asserts that the Act violates the horizontal separation of powers. AT Br. 41-42, 49-52. But AAM expressly disclaimed any reliance on such a theory in its preliminary injunction motion, thus waiving this argument.

As AAM acknowledges, it pled a horizontal separation of powers claim separately from its dormant Commerce Clause claim. *Id.* at 52, n.22; *see* A202, A207-08. But AAM's briefing on its preliminary injunction motion only argued that it was "likely to succeed on its extraterritorial *Commerce Clause* claim." Doc. 62 at 7 (emphasis added). And at oral argument on the preliminary injunction motion, AAM's counsel confirmed that its motion was "based on the dormant [Commerce] [C]lause issue as opposed to any of [its] other claims." A124. Accordingly, the district court only addressed "AAM's extraterritoriality argument under the dormant Commerce Clause" in denying the preliminary injunction, leaving aside any claims under "*Pike* balancing, . . . the Due Process Clause, or . . . *horizontal separation of powers*." A12 (emphasis added).

By "expressly abandon[ing]" any argument based on its horizontal separation of powers claim in the district court, AAM has waived any such argument. *Walker v. Baldwin*, 74 F.4th 878, 881 (7th Cir. 2023); *see Speech First*, 968 F.3d at 642 (on

---

imposed liability on firearm industry members that did "no business in California" based on "transactions that involve no California parties or destinations").

appeal from denial of preliminary injunction, party "waived . . . argument" it did not raise "before the district court"); *Hildreth v. Butler*, 960 F.3d 420, 425 n.3 (7th Cir. 2020) (explaining that forfeiture occurs when "a party inadvertently fails to raise an argument in the district court," whereas waiver "occurs when a party intentionally relinquishes a known right" (cleaned up)). Accordingly, AAM's waiver "precludes appellate review" of any horizontal separation of powers issue, *Walker v. Groot*, 867 F.3d 799, 803 (7th Cir. 2017) (cleaned up), and this court "need not even consider whether to apply plain error review," *Lewis v. Ind. Dep't of Transp.*, 173 F.4th 876, 884 (7th Cir. 2026) (cleaned up). Nor has AAM made any effort to explain why the "limited" and "extraordinary" use of plain error in civil cases would be warranted here, even if it could be invoked. *Walker*, 867 F.3d at 803 (cleaned up).

To the extent that AAM now argues that this court can reach the horizontal separation of powers issue because it is relevant to its dormant Commerce Clause claim, *see* AT Br. 51 (stating that horizontal separation of powers "ha[s] a home in the Commerce Clause"), this argument is both belied by AAM's arguments in this case and foreclosed by *Ross*. As explained, AAM framed its horizontal separation of powers claim as a basis to invalidate the Act independent of the Commerce Clause. *Compare* Doc. 34 at 33 (claiming that Act "violates the Constitution's separation of powers" without mentioning the Commerce Clause (cleaned up)) *with id.* at 32, 35 (claiming the Act "violates the Commerce Clause" by regulating "out-of-state commerce" and imposing "a substantial burden on interstate commerce"). Furthermore, the footnote in *Ross* on which AAM principally relies indicated that a

"dormant Commerce Clause question" is something different from "testing the territorial limits of state authority under the Constitution's horizontal separation of powers." *Ross*, 598 U.S. at 376 n.1. And any suggestion that the dormant Commerce Clause "limits . . . the territorial bounds of each state's regulatory power" without concern for economic protectionism is foreclosed by *Ross*, as explained *supra* pp. 27-31. AT Br. 49.

Waiver aside, the horizontal separation of powers refers to the "territorial limits of state authority." *Ross*, 598 U.S. at 376 n.1. But as explained *supra* pp. 32-35, the Act does not exceed the territorial limits on Illinois's authority — it prohibits unreasonable price increases for drugs ultimately sold in Illinois. Illinois "indisputably has an interest in protecting" its residents from such harms that the Constitution does not prohibit it from defending. *CTS*, 481 U.S. at 93.

**B.      AAM failed to make a clear showing that it would suffer irreparable harm unless the Act was enjoined while its case was pending.**

Even if AAM had established any likelihood of success on the merits, the district court's order should be upheld because AAM failed to make a clear showing that it would "suffer irreparable harm in the period before final resolution of its claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-24 (7th Cir. 2015). AAM's claim of irreparable harm was principally based on its members' allegedly "irreparable economic losses" — the choice between "violating the Act and facing draconian financial liability" or "losing significant revenue." AT Br. 55; *see* Doc. 52 at 24-26 (similar).

But the Act does not prohibit most generic drug price increases, as explained *supra* pp. 22-24. It only prohibits increases that are "unconscionable" *and* that cannot "be reasonably justified by . . . an increase in the cost of producing the . . . drug" or "the cost of appropriate expansion of access to the . . . drug to promote public health." 410 ILCS 725/5. And the Act includes robust procedural protections that permit drug manufacturers and distributors to show that their price increases do not meet that definition. *See id.* § 10(b) (authorizing Attorney General to send "notice" to party suspected of violating the Act, to which party must issue responsive "statement" with reasons for price increase); *id.* § 10(c) (requiring Attorney General to petition court for order granting relief under the Act). There is no authority to support the notion that a business's inability to reap "unconscionable" and "excessive" profits can be considered irreparable harm. *Id.* § 5.

Setting that aside, AAM offered no evidence that its 39 out-of-state member organizations had been forced to forgo plans to price-gouge Illinois consumers because of the Act. *See* Doc. 34 at 4, 7, 40-41. Indeed, AAM's sole evidence supporting its claim of irreparable harm was Emerson's declaration describing Sandoz's abandoned plan to increase one of its drug's prices, *see* Doc. 52 at 25, which, as explained *supra* pp. 22-24, did not demonstrate that Sandoz planned to engage in price gouging prohibited by the Act. Thus, Sandoz's decision to forgo a price increase out of its own fear that the increase would be considered prohibited price gouging is a "self-inflicted wound[ ]" that is "not irreparable injury." *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003).

Nor did Emerson estimate the impact of the foregone price increase on Sandoz's business, merely stating that it would take in "less revenue" and that selling this specific drug would "not longer be profitable" without the price increase. A226; *see also id.* (alleging, without estimating, loss of "significant revenues"). And although Emerson made the conclusory statement that this revenue could not be "recoup[ed]," he noted that the abandoned price increase would have "offset price reductions on certain other Sandoz products," suggesting that those price-reduction plans could be abandoned to make up for any lost revenue Sandoz incurred based on its fear of the Act's enforcement. *Id.* This vague, conclusory speculation about the Act's supposed effects on Sandoz's revenue did not make a clear showing that AAM would suffer irreparable harm. *Compare Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976, 990 (7th Cir. 2026) (although "[q]uantifiable harm is typically not irreparable," plaintiffs had shown irreparable harm by offering evidence that "combination of lost revenue" and risk of "substantial financial penalties" caused by state law would force them "to shut down while awaiting trial") *with Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 391 (7th Cir. 1984) (business losses that were "painful," but not "fatal," did not merit preliminary injunction). In any event, Emerson's speculation about possible losses to Sandoz did not support AAM's broad request for injunctive relief in favor of all of its members. *See* Doc. 51 at 1; *see also e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007) (courts should "tailor injunctive relief to the scope of the violation found" (cleaned up)).

Furthermore, there was no evidence that the predicted harm to Sandoz would occur "in the period before final resolution of [AAM's] claims," *BBL*, 809 F.3d at 323-24. The Act has been in effect since January 1, 2024. 410 ILCS 725/99 (2024). The district court denied AAM's motion for a preliminary injunction in September 2025. Doc. 85 at 16. AAM presented no evidence that, during that time, the Attorney General had investigated or initiated any enforcement proceedings against any AAM member — or any other entity — for a violation of the Act, or that such enforcement efforts were likely to occur before final judgment. The prospect that those events might occur before AAM could obtain a final resolution of its claims is "speculative harm," not evidence of likely "irreparable injury." *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 846 n.3 (7th Cir. 2005). And even if such an investigation or enforcement action were initiated, the manufacturer or distributor subjected to those actions could raise an as-applied challenge to the Act's validity or scope.

For its part, the district court's determination that AAM made a clear showing of irreparable harm rested on two flawed determinations. *See* A12-14. First, the district court recognized that "economic losses alone are ordinarily insufficient to demonstrate irreparable harm," but reasoned that AAM's members' losses would be unrecoverable "due to sovereign immunity." A14 (citing *Staffing Servs. Ass'n of Ill. v. Flanagan*, 720 F. Supp. 3d 627 (N.D. Ill. 2024)). But that determination presupposes that AAM's evidence showed an actual harm in the first place. As explained *supra* pp. 47-49, it does not. Furthermore, the district court ignored that, even in cases in which a party sues a state official in his official capacity and seeks

49

only declaratory or injunctive relief, this court has applied the presumption that economic harm is typically "not irreparable." *Wisconsinites*, 172 F.4th at 990; *see*, *e.g.*, *id.* at 980 (businesses selling e-cigarettes and vapes sued Secretary of Wisconsin Department of Revenue in his official capacity, seeking "to enjoin enforcement of" Wisconsin statute).

On appeal, AAM cites *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134 (7th Cir. 1994), to support its assertion that "Illinois's sovereign immunity" renders economic losses by its members irreparable. AT Br. 55. But that case says nothing about state sovereign immunity or its effect on the issue of irreparable harm. To the contrary, this court recognized that the plaintiff showed that, if it were forced to absorb the increased costs at issue in that case, it would "go out of business in approximately [six] months" or else pass off the costs onto its customers and lose "goodwill," which is typically irreparable. *Gateway*, 35 F.3d at 1140 (cleaned up). AAM offered nothing to suggest that Sandoz or any of its members faced a risk of going out of business or losing goodwill because of the Act. Instead, Sandoz faced unspecified diminished revenue that was caused by its own caution rather than any imminent risk of the Act being enforced.

Second, the district court's reference to the "costs of complying with the Act" was misplaced. A14. Indeed, "injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm." *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980). Exceptions to that general rule may arise when compliance with a law would require conduct that could not be easily

undone, such as physical alteration of a business's premises.  *See, e.g., Am. Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572, 573, 580 (7th Cir. 2001).  But complying with the Act would require no significant alteration in AAM's members' businesses — they would simply be prohibited from price gouging Illinoisans.

AAM also argues that "unconstitutional regulation of AAM members" is, in itself, irreparable harm, citing the principle that "'the existence of a continuing constitutional violation constitutes proof of irreparable harm.'' AT Br. 56 (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)).  But this court has only recognized that principle as to First Amendment and due process violations, not the dormant Commerce Clause's limit on state authority.  *See, e.g., Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chi.*, 56 F.4th 437, 450-51 (7th Cir. 2022) (First Amendment cases); *Preston*, 589 F.3d at 303 & n.3 (due process); *see also Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1202 (7th Cir. 2023) (declining to decide whether "an alleged Second Amendment violation gives rise to a presumption of irreparable harm, and if so, whether any such presumption is rebuttable or ironclad").  And at least one court of appeals has held that an independent showing of irreparable harm is necessary when a party brings a dormant Commerce Clause challenge.  *See, e.g., Grand River Ent. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007) (plaintiff's failure to "demonstrate a likelihood of irreparable harm" was "dispositive," such that court did not have to consider the "merits of [its] federal antitrust and dormant Commerce Clause claims").

Nor does AAM explain why a dormant Commerce Clause violation is comparable to a violation of First Amendment or due process rights. Unlike those individual rights, the dormant Commerce Clause's scope is unclearly defined and of questionable provenance. *See Ross*, 598 U.S. at 370 (describing "vigorous and thoughtful critiques of . . . the [dormant] Commerce Clause" by members of the Court (cleaned up)); *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 578 (2015) (Thomas, J., dissenting) ("the negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application" (cleaned up)); *Tyler Pipe Indus., Inc. v. Washington State Dep't of Revenue*, 483 U.S. 232, 259-60 (1987) (Scalia, J., concurring in part and dissenting in part) ("since the doctrine of the negative Commerce Clause was formally adopted as holding of this Court, . . . our applications of the doctrine have . . . made no sense" (cleaned up)). Nor is any such right inviolable — after all, Congress may "authorize states to engage in activities that but for the authorization would violate the dormant commerce clause." *Hirst v. Skywest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018) (cleaned up).

Although AAM cites two district court orders to support its argument that any dormant Commerce Clause violation proves irreparable harm, AT Br. 56 (citing *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp. 2d 844 (N.D. Ill. 2000), *appeal dismissed* 212 F.3d 995 (7th Cir. 2000), and *Ind. Fine Wines & Spirits, LLC v. Cook*, 459 F. Supp. 3d 1157 (S.D. Ind. 2020)), they lack "precedential authority," *Howard*, 160 F.3d at 359. Nor is either order persuasive. In *Kendall-Jackson*, the court relied

on several out-of-circuit district court orders to conclude that a dormant Commerce Clause violation "constitutes irreparable harm" without discussing this court's precedent recognizing that presumption only in First Amendment and due process cases. 82 F. Supp. 2d at 878. And *Ind. Fine Wines* relied on *Preston*, which presumed that a due process violation was irreparable harm. 459 F. Supp. 3d at 1170; *see Preston*, 589 F.3d at 303 & n.3. Thus, neither of these orders offer any basis to expand the presumption of irreparable harm to all dormant Commerce Clause violations.

### C. The district court did not abuse its discretion in determining that the equities favored the Attorney General.

The district court acted well within its discretion when it concluded that AAM failed to make a clear showing that "'the balance of equities tip[ped] in [its] favor, and that an injunction is in the public interest.'" *K.C. v. Indiv. Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 613 (7th Cir. 2024) (quoting *Winter*, 555 U.S. at 20); *see* A14-16. As explained, *see supra* pp. 46-53, AAM failed to establish any irreparable harm resulting from the Act. At most, it offered evidence as to speculative harm to one of AAM's many out-of-state members that was not attributable to the Act.

By contrast, "[t]he injunction of a state's duly enacted law causes significant harm to the state and the public interest." *Wisconsinites*, 172 F.4th at 990. That is particularly true here, where the Act prohibits a pernicious, unjustifiable form of price gouging. *See* 410 ILCS 725/5, 10; *see id.* § 2 (setting forth legislative findings on "devastating impact" of drug price increases, a "pattern and practice of price

53

gouging" by drug manufacturers, and impacts on Illinoisans' "health, safety, and welfare").  The district court did not abuse its discretion in determining that the equities favored the Attorney General.

On appeal, AAM's argument that the district court abused its discretion in balancing the equities largely rests on the notion that it is likely to succeed on the merits.  AT Br. 57-58.  But that is incorrect.  *See supra* pp. 26-46.  Beyond that, AAM asserts that its members would suffer "tremendous economic losses" absent an injunction, which is a gross distortion of the record.  AT Br. 58.  Notably, AAM cites nothing in the record to support that statement, likely because there is no such evidence to cite.  Indeed, as explained *supra* pp. 21-24, AAM's evidence amounted to Emerson's unfounded speculation that the Act could potentially apply to a single drug's price increase that Sandoz abandoned.  This hardly shows that the Act will "force[ ]" drug manufacturers to "withdraw their products from the market" and create "drug shortages."  AT Br. 58-59.  And if such drastic results were likely to occur, AAM presumably would have been able to offer such evidence from its members.

At the very least, AAM's thin evidence did not support its request for a broad preliminary injunction enjoining the Act's enforcement "against AAM's members, or their agents, privies, or licensees, based on their sales of generic drugs or biosimilars that occur outside Illinois."  Doc. 51 at 1.  Courts must "tailor injunctive relief to the scope of the violation found."  *e360 Insight*, 500 F.3d at 604 (cleaned up).  As explained, evidence that a single AAM member abandoned a plan to increase prices

hardly shows that AAM's 39 other out-of-state members will suffer any harm as a result of the Act.  And there was no dispute that the Act could constitutionally be applied to AAM's Illinois-based members, *see* A80, even if they sold drugs outside the State.  Thus, the district court did not abuse its discretion in denying AAM's sweeping request for a preliminary injunction.

## CONCLUSION

For these reasons, Defendant-Appellee requests that this court affirm the district court's denial of Plaintiff-Appellant's motion for preliminary injunction.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for Defendant-Appellee

/s/ Carson R. Griffis
**CARSON R. GRIFFIS**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov

July 10, 2026

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2601), in 12-point Century Schoolbook BT font, and complies with Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32 in that the brief contains 13,892 words.

/s/ Carson R. Griffis
CARSON R. GRIFFIS
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on July 10, 2026, I electronically filed the foregoing Brief of Defendant-Appellee with the Clerk of United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

I further certify that the other participants in this appeal, named below, are CM/ECF users and will be served by the CM/ECF system.

William M. Jay
wjay@goodwinlaw.com

Andrianna D. Kastanek
akastanek@jenner.com

Isabel M. Marin
imarin@goodwinlaw.com

Yaira Dubin
ydubin@gibsondunn.com

Zachary D. Huffman
huffmanz@sullcrom.com

Morgan L. Ratner
mratner@gibsondunn.com

Andrew R. Vance
avarcoe@uschamber.com

Jonathan D. Urick
jurick@uschamber.com

/s/ Carson R. Griffis
CARSON R. GRIFFIS
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-2447 (office)
(773) 505-5282 (cell)
Carson.Griffis@ilag.gov